Our next case is ImmunoGen v. The Undersecretary of Commerce, 2023-1762. Good morning, Your Honors. Good morning. Mr. Mollen, when you are ready. Good morning, Your Honors. Good morning. May it please the Court. I'd like to focus on three points this morning, the first having to do with the issue of indefiniteness, and the other two on the issue of obviousness. Starting with indefiniteness, the intrinsic evidence, including the claims, the specification, and the file history, make clear that the claim formula for AIBW is the one and only formula recited in the specification, both in the definitions and Example 4. Let's go to obviousness, because if you lose on either, you lose. The difference between what's in the claims and what's in the prior art is six versus seven milligrams per kilogram and the definition of body weight. And doses, it's within the scale of the art to vary doses to obtain the best dose, and the concept of AIBW was in the prior art. So why wasn't the obviousness determination correct? It was incorrect for two different reasons, Your Honor. The first having to do with the motivation, and the second having to do with the reasonable expectation of success. Starting with the motivation, when you say, Your Honor, respectfully, that AIBW, that method of dosing, was in the prior art, it was in the prior art on totally different things. It was in the prior art in nutrition, in small molecule drugs and different ones, but there are two salient key points that are undisputed and part of the Court's factual findings. One, that an AIBW dosing regimen had never been used with an ADC, with an antibody drug conjugate, which is a completely different type of drug with different pharmacokinetic properties. And number two, and we probably should have highlighted this even more in the brief, that AIBW had never been suggested in any drug, in any area, to address the issue of ocular toxicity. Not in any drug. Okay, but you didn't show that, but the PTO expert said that someone skilled in the art would have looked to AIBW as a matter of course, and the District Court credited that testimony, and so why is that conclusion clearly erroneous? Your Honor, I would say the following, that that conclusion in view of those factual findings should be reviewed here under a de novo standard because the ultimate conclusion of obviousness, just having an expert say it, is an issue of law. The underlying factual findings that are not in dispute and that the District Court found were that, number one, it wasn't recognized that A53 had an ocular toxicity problem, but even if you got there, the court found that AIBW had never, ever been used with this category of drug. Wait a second. You're saying that's a legal issue? Why isn't that a fact issue as to whether someone skilled in the art would be motivated to look to AIBW in this connection? I mean, that's like quintessential fact finding. Your Honor, I would respectfully disagree if the issue of obviousness is ultimately a question of law with underlying factual determinations. The facts are the ones that are recited, that it's never been used in this category before, that it's never been used in this way before. As a matter of fact, Your Honor, in the indefiniteness section, the court went out of its way to say you'd be wandering the woods not knowing what AIBW formula to use. Then you get to obviousness, and with the specification out of hand, he says you'd focus right in on it. Those are ultimately legal conclusions based off the facts of record. Does this agree with you on that? Do you lose? No, Your Honor, because there's one other fundamental problem, Your Honor, with the whole thing that, again, underlies the entirety of the obviousness issue, which is the following. As this Court is well aware, and as Your Honors have been authors on opinions on, of course you must always show reasonable expectation of success to show obviousness. An example of this is, of course, the Teba Corsett case, where even if it would have been obvious in terms of a motivation to combine different references, you'd fail without a reasonable expectation of success. In this case, the district court, neither the district court nor the government, ever really even contend that someone who is wandering around and trying all these different things and trying AIBW and trying different formulae and trying to solve it this way would have expected success in the end of the day. What they do remarkably, and I point Your Honors to the red brief at page 52, is they say that if expectation of success in the result is required, then this Court's precedents are wrong. At page 52, they identify six cases from this Court, and they say that these cases are wrongly decided in that they require expectation of success in the outcome. They effectively admit or acknowledge that if the test is, as this Court has said, six different times and many more times than that, that there has to be a reasonable expectation of success in the outcome, that they can't satisfy that. We thought that was striking in page 52 of the red brief. We have a situation where the district court did make a finding of reasonable expectation of success, correct? The district court has a section entitled reasonable expectation of success, and if you read that section, it basically repeats what he said previously in terms of it would have been reasonable for someone to experiment in the way that they said the inventors experimented. And as a matter of fact, they point to the inventor's old testimony, Judge Ellis did, to try to support that it would have been reasonable to experiment in that way. Nowhere in the reasonable expectation of success analysis does it carry through and say that a person skilled in the art carried by the same motivation that he identifies. The motivation to try to solve ocular toxicity would have expected to solve the problem. So there's a mismatch there. It's not unlike this Court's decision in Institute Pasteur where the party challenging obviousness there used one motivation and said they would have wanted to come up with a viable cell, and then on reasonable expectation of success said it didn't matter what was viable. Their entire motivation case is based on the proposition that someone would have used AIBW to try to solve ocular toxicity, and nowhere, nowhere in their briefs and nowhere in the district court's decision is there any analysis where it even tries to say that that person skilled in the art reasonably would have expected to succeed in carrying out that method. So that is ultimately a fatal error irrespective, Your Honor, of whether we disagree on the ultimate conclusion of obviousness on the motivation side being an issue of law or fact. Of course, this is claimed as a method of treating a patient having an FMLIR1-expressing ovarian cancer, and the prior act deals with discloses treating ovarian cancer with this compound. We're not talking about a big difference. We're talking about we fundamentally think it's a patentable and significant difference between the two. Your Honor, they are giving the same drug. I won't acknowledge this as I should, I think. In the prior act, they were talking about giving the same drug to treat the same disease. That is true, but that ended up having terrible toxicity issues. You had grade 3 ocular toxicity, which means you couldn't function. You could go blind from the prior treatment. The fundamental difference here was a paradigm shift, not a simple dosing shift going from 1 to 5 milligrams or something like that. A paradigm shift to use a different method, a different regimen, that not only had never been used with an ADC, but had never been used in any drug. What does reasonable expectation of success mean with respect to these claims? The claims don't require an effective treatment, right? The claims, I would say the following in two respects. Is my statement correct? I would say the claims don't say effective treatment, but this Court's precedent makes clear, for example, in Teva B. Corsept, it was required to be a safe and effective treatment in that case, even though the claim didn't recite that. Anyone looking at a method of treating these ovarian and peritoneal cancers would understand that you would have to be successful in having both a safe and effective treatment in the end of the day. So your whole argument about reasonable expectation of success depends on reading the claims as requiring a safe and effective treatment? I disagree, Your Honor, but it's one of the two arguments. I have two arguments with respect to reasonable expectation of success. Respectful, Your Honor. The first is, just like in other precedents of the Court, like Teva B. Corsept and many other cases, the claim to treating a patient with the disease carries with it the idea that it has to be safe and effective. And that case expressly said that. The claim didn't say, in that case, it was methasperazone. In that case, it didn't say it has to be safe. It said a method of treating a patient, and it was found to be non-obvious by this Court because it didn't show, the prior art didn't suggest, it would be safe and effective to give that dose, 600 milligrams. If it weren't safe and effective, it would be inoperative. They could make that argument. There's not an enablement or a utility argument here. Do you want to quickly address indefiniteness? Sure, Your Honor, but may I just – I would like to do whatever the Court would like, but may I make my second point in response to Judge Dyke? The second reason it doesn't turn on safe and effectiveness is, institute pasture is really telling. If you're going to rely on a certain goal for your motivation, their goal, the government's goal is we're going to solve ocular toxicity, then it makes no sense to decouple what the reasonable expectation of success is going to be from what motivated you. When you're saying is it obvious, would you have been motivated, they say yes by ocular toxicity. The success, the reasonable expectation of success for it to have been obvious must match that goal, and this Court found exactly that in institute pasture. That case, the claim did not require a viable cell in the end of the day that would work for some intended function. It was simply a product claim, and in the end of the day, it was a method claim, but it didn't require viability, the Court found, but in the end of the day, the Court said specifically, and I'll quote it, that expectation of success analysis must match the highly desired goal, the thing that created the motivation. With respect to indefiniteness, Your Honor, I'm sorry to have digressed there, but with respect to indefiniteness, to answer your question, it's the claims, the specification, and the file history all compel a finding that the definition in the claims, to be used in the claims, is the only definition in the specification. The claims themselves, it is true, do not spell forth the definition, but the claims say two very important things. They say both what drug you're going to use, 854, and that's a finding of the court at finding of fact 37, and they also say the dosage. Would you infringe if you didn't use example four? That's correct. Absolutely true. If you do not use the formula in example four, you would not infringe, and this is an interesting case, Judge Dyke. You don't think there would be a DOE argument made by you? There will not be, and I'll represent that to the Court here, but there would not be if you don't use the method, the formula set forth in the claim. The formula set forth in the claim is the only formula, and the formula set forth in the specification is the only formula anywhere in the intrinsic evidence for AIBW. Why is that not a fair read, Bob, but just your quote that the preface, for example, means that this is only one example of a number of potential? It's not a fair read, Your Honor, and may I just briefly digress for one second. Teva Sandoz and VASF both say that those are issues of law that are de novo, what the intrinsic evidence teaches, and the intrinsic evidence says AIBW is a certain way of looking at things, and, for example, that formula, if you were to talk about my height, height would be how you measure someone. For example, 6'3", that's what I am. Maybe I'm 6'2", now, whatever the case is. But more importantly, this claim sets forth not only what the drug is, 854, which this Court previously found was important when it sent it back down the first time. It also tells you it's 6 milligrams per kilogram. The only place you'll find that anywhere in the specification, those things, are in Example 4, which set forth the AIBW. There would be no support for those claims without it. And the other very interesting thing, Your Honors, is that this is an interesting case. It's a 145 case. The patent hasn't yet issued. As our friends acknowledged at the last oral argument, it means the 145 is part of the intrinsic record. What we're saying here is actually part of the intrinsic record of this case. It's very unusual because the patent hasn't issued. If you want to make it clearer, file a continuation application. What's the problem with that? Your Honor, we think, first of all, that there is absolutely no lack of clarity as to what AIBW would be used, once you look at the specification and the prosecution history. It's been 10 years since we filed this application. It should not have to linger on further. The claims are perfectly definite as they are, and we shouldn't be put in a position where we have to go back and maybe have new rejections by the Patent Office at this point in time. The 145 action is to get a thumbs-up or a thumbs-down on the validity of these claims, and we think that they're clearly valid, both on the indefiniteness front and on the obviousness front. And I see I only have a minute left. Unless the Court has questions, I'll reserve. We'll save it. Thank you. Thank you, Your Honors. Dr. Kasdan. May it please the Court, Daniel Kasdan on behalf of the USPTO. I'll start with obviousness, because I think that was where most of the focus was. So just one of the points that I think Judge Dyke mentioned, or maybe Judge Lloyd, that this drug had been used to treat this type of cancer in very similar doses. The prior Lutz references focuses on doses of 6 milligrams per kilogram total body weight. And what they're doing is they're saying, we use a new dosing methodology, adjusted ideal body weight. And the expert testified that it would have been obvious to use this, because, and I think they undersold how widespread adjusted ideal body weight had been. It had been used for smaller molecules, larger molecules. Contemporaneously, it had been used for a different immunoconjugate. The expert testified, and the district court found, that as a factual matter, this is what people would look at. And this court has said that motivation to combine is a factual issue. And so I think that that should be reviewed for clear error. So what about the reasonable expectation of success? So the district court found, and I'm reading from page 52, both Dr. Frigg, that was the PTO's expert who wasn't paid, and Dr. Tolcher testified that a skilled artisan understood that dose was relevant to toxicity, and a skilled artisan would therefore have had a reasonable expectation that changing the dose would impact the resulting ocular toxicity. That's a finding, that you know that toxicity is often correlated to dose. There's testimony from both experts that that's true. And so you'd reasonably expect that if you start moving the dosing methodology around, you'll likely affect toxicity in one direction or another. That seems like a reasonable expectation of success, I think. What about efficacy? Is efficacy and safety part of the claim here? It's not part of the claim, so I don't know what specific amount is required. And remember, this is important, and I think that this gets – what they say in the patent is that when they were giving 5 milligrams per kilogram total body weight, that's the prior art approach, 1 in 11 patients had grade 3 ocular toxicity. The actual – so this came up in the secondary considerations findings, and this is on page – appendix page 58. Ultimately, they had 11 percent grade 3 ocular toxicity the way they dosed it, under 6 milligrams per kilogram. They changed the dosing methodology, but they have not – there's no evidence that this change has actually improved toxicity or efficacy. So whatever the prior art has, that's what we know then to have still. This was partly litigated at trial, but not appealed, that there's no evidence that they've improved by changing to adjusted ideal body weight, that they've improved safety or efficacy in any way. And that was – Safety and efficacy is a one-on-one issue, operativeness, and that's not raised, right? Right. That's not raised. I just mean to say that they're not – this change hasn't settled – it's not like they now have changed it and unexpectedly have great efficacy or safety that they didn't have before. It's the same efficacy and safety they had. So they've changed the dosing, and they haven't actually changed anything in the result as far as we can tell. If there are no other questions – Oh, I wanted to – on ocular toxicity, it's important to note that while nobody had – there's no reference that we showed that ocular – that people changed to adjusted ideal body weight successfully to combat ocular toxicity. There is the alpha now reference that people tried that. So that means this is also with – at least the district court's finding that people who face ocular toxicity would test out adjusted ideal body weight. That's supported, and so I think that's not clearly erroneous. If there's nothing else on obviousness – and I'm happy to take more questions. Can I ask you – this is probably a very stupid question, so you can just abuse me of my notion that I have. But I felt a little tension between the argument you were making with respect to indefiniteness and obviousness, mainly because in indefiniteness you kept repeatedly saying, we don't know what this AIBW means. We have no idea. But with respect to obviousness, your real hook is everybody knew what it was. It was used all the time in the prior art. Isn't there a tension? I mean, for you suggesting that nobody knows what it is because it's an incommensurate formula, and then saying we all know what it is because it's in the prior art. There are different arguments made to make different points, but what am I missing? I see the tension, but to me, let's say that we're – maybe let's go back to the 10-hour case. So there are three ways to use molecular weight. It could be obvious to use any of the three tests for molecular weight, but it's still important that there be one that the patent is claiming. So adjusted ideal body weight – let's just focus on the correction factor. It could be 0.4 or 0.5. Those are, let's say, both known correction factors. It's indefinite if you say my claim would apply to either one of them because I don't know if I'm infringing or not because I have to choose which of the correction factors to use. But it would still be obvious to try them both. So if there are multiple options, all the options could be obvious, but you still, as a matter of definiteness, need to tell me which of those you're trying to claim so that I know what the limits of the claim are. Does that make sense? Well, both. Well, both. You can say both, but they're not saying that they mean both. They're actually saying they mean one specific one. But under obviousness, multiple depends on what you're talking about. If you're talking about a finite group that you would pick against as opposed to thousands or millions or whatever, and I don't know what that number is associated with AIBW. It's a range. I mean, it's just basically a correction factor. It's between – depending. It could be 0.2 to 0.5 or 0.2 to 0.8 or 0.9. So you're picking within that range, and we feel that the claim is indefinite as to which of those you're picking, but that specific choice is just routine optimization, which you would find anyway. So it's sort of both obvious, but you haven't specified which one you mean. In terms of indefiniteness, I just want to focus on one point here, which is there is a definition section, and I feel like an applicant reading a claim has a right to look to the definitions and say, whatever you said in the definitions, that's what I'm going to understand the terms to mean. And the term, let's say, ideal body weight, which is part of the definition, says that optionally you can include frame size. But the formula they're proposing doesn't include frame size. So that means that they're saying that the definition, they're not putting it straight, and they're limiting it narrower than the definition. So again, paragraph 69, this is on page APPS 157, they say it optionally includes frame size. They're saying that isn't an option, even though that's in the definitions. So it seems to me that given that we're still in prosecution, and 145 is still prosecution, they should file a continuation and then file cleaner claims, which they did. I think they recently abandoned it, but they could have just gone through with those claims, and then we would have cleaner claims, which is a benefit of prosecution. I know I have some time left, and I'm obviously happy to answer any questions. But if there's nothing else, I'm happy to cede my time. We don't lose any points by not using up all your time. Thank you. Thank you. Dr. Kazdin. Mr. Morin, we'll give you two minutes for a while. Thank you, Your Honor. Very quickly on a couple of issues. My friend said that AIBW had been used on immunoconjugates before. That's incorrect. Rosenblatt, which is the reference I think he was referring to for simultaneous invention, was a radio immunoconjugate, which has a radioactive piece, and it's not relevant, therefore. It's not prior art. For simultaneous invention, as this Court has held multiple times, it has to actually be the invention, not something that they argue is similar. Radioactive materials have very different properties than chemotherapy drugs. Most importantly, on the reasonable expectation of success point, the best that my friend could come up with is that varying dosing could affect toxicity. Of course, varying dosing in general could affect toxicity. There's still no contention that someone skilled in the art at the time would have looked to AIBW and thought that that was, had a reasonable expectation of success of solving this problem, despite it never having been used with the same category of drug and never having been used at all, ever, on ocular toxicity. My friend came up with only one example, the Alpinar reference. In the entirety of this three-day trial and the massive appendix that we have here, the Alpinar reference references AIBW in passing and then concludes that you should use a different method. It is a finding of the Court below that, indeed, AIBW has never been suggested, and that's a finding of fact that we are willing to live with and reembrace, that it's never been suggested for AIBW. That is a finding of this Court that is at paragraph 72 of the Court's decision. And, Your Honor, I want to be a little more precise on a question that you raised, Judge Dyke. You asked me earlier, well, if the standard of review on the motivation combined is clear error rather than de novo, do we lose? And the answer is no, Your Honor. While we think it's a de novo standard of review, when you take all the things that we talked about, that had never been recognized to be a problem, similar to a forced lab situation, that AIBW had never been used to address ocular toxicity, when you get to the point that Judge Post made that, in the decision, when the Court wanted to emphasize indefiniteness, it said there's all sorts of different ways to do it. Then, in obviousness, they zero in on the only one. When you layer hindsight on top of hindsight on top of hindsight, it is clear error to find these claims obvious. And finally, I'll close with this. Again, the Court and our friends' lack of response, despite more time on this point, is telling. At page 52, they essentially acknowledge that if the test is, as this Court has said, in six different cases, that you need a reasonable expectation of success on the outcome, then they cannot win this case. And I heard them say nothing in response to that. On page 52 of their brief, they advocate effectively an en banc type of an argument that this Court should disregard the prior precedents of this Court. This Court's prior precedents are both right and they're binding. Unless the Court has additional questions, I thank the Court for its time. Thank you, Counsel. The case is submitted.